**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 2:10-cr-0353-JCM-LRL |
| v. | ) |
| | ) MOTION TO SUPPRESS FOR |
| DEWAYNE PATTERSON, | ) FOURTH AMENDMENT |
| | ) VIOLATION (#21) |
| Defendant. | ) |
| | ) |

# REPORT & RECOMMENDATION

The defendant, Dewayne Patterson, is under indictment on one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); one count of Possessing a Firearm During a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A); and two counts of Possession with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 841. These charges stem from a "knock and talk," which led to a police search of a motel room and the seizure of drugs and a handgun. The matter before the court is Patterson's Motion to Suppress (#21). Patterson contends that all tangible and testimonial evidence must be suppressed because the search and seizure were unreasonable within the meaning of the Fourth Amendment. Also before the court are the government's Opposition (#24) and defendant's Reply (#26).

## BACKGROUND

An evidentiary hearing was conducted on January 25 and February 1, 2011. The government called as witnesses Patterson's then girlfriend, Kanchaka Hodges; Det. Voir-Yulo Kwity of the Las Vegas Metropolitan Police Department ("Metro"); Metro Det. Chad Knudson; and Metro Det. Joseph Winn. Patterson testified on his own behalf. Based on the testimony adduced at the evidentiary hearing

and the exhibits attached to the parties' papers, the court finds the following facts have been established by a preponderance of the evidence. On June 18, 2010, at approximately 5:00 p.m., Det. Kwity, who was assigned to Metro's Tourist Crimes Unit, received information from another officer that an individual named Dewayne Patterson, a convicted felon, had checked into the Motel 6 located at 195 E. Tropicana Avenue in Las Vegas, Nevada. As a convicted felon, Patterson was subject to Nevada's felon registration requirement,[1] and therefore was required to report to Metro and register a change of address within 48 hours of changing residence.

Det. Kwity's records check confirmed that Patterson was a convicted felon subject to the reporting requirement. Det. Kwity contacted the Motel 6 and determined that Patterson had been registered to room 133 of the motel for about four days. Based on this information, the detective decided to conduct a knock and talk at the Motel 6. At 11:30 p.m. on June 18, 2010, Det. Kwity, along with Det. Knudson, Det. Winn, and Det. Sgt. S. Connell, knocked on the door to room 133. The room contained a queen-sized bed, a table with two chairs, and a television. A bathroom was located at the rear of the room. There was no kitchen or kitchenette. This particular Motel 6 is located in a "high crime area." Patterson was in the room with Hodges and her infant son when detectives knocked on the door. The events that unfolded from that point forward are in significant dispute.

### The Facts as Alleged by the Government

The detectives' account begins with Patterson answering the door. At the hearing, Detectives Kwity, Knudson, and Winn all testified that Patterson fully opened the door in response to the detectives' knock. Based on a printed crime report photograph of Patterson, Det. Kwity immediately recognized Patterson as the same Dewayne Patterson depicted in the photograph. Kwity asked Patterson for his name, and Patterson responded, "Dewayne Patterson." Kwity then asked Patterson if he could conduct a protective sweep of the room, to which Patterson replied, "Sure, go ahead." At the hearing, Kwity testified that he asked Patterson to step outside and Patterson willingly complied. According to

---

[1] NRS 179C.110

2

Det. Winn, Patterson stood outside with him uncuffed for a couple of minutes while Det. Kwity and Det. Knudson were inside the room.

Detectives Kwity and Knudson conducted a protective sweep of the room with guns drawn, while Hodges remained in the bed with her son.  Kwity testified that because it was cold outside he allowed Hodges and her child to remain in the room.  During the protective sweep Det. Kwity noticed a box of plastic sandwich baggies on the table, which, based on his training and experience, he believed was indicative of drug trafficking activity.  He interviewed Hodges, who said she'd known Patterson for about seven months, and they'd been romantically involved for about three months.  Kwity noticed numerous changes of clothes for Hodges and the baby, baby formula, diapers, milk, a pump and bottles, and on that basis determined that Hodges had standing to consent to a search of the room.  Det. Knudson presented Hodges with a consent to search form, which he read to her aloud.  The form was filled out to indicate that the detectives were searching for drugs.  Hodges voluntarily signed the form. At no time was Hodges prevented from interacting with her son, who slept through most of the encounter.

Det. Kwity then stepped outside where Patterson was standing with Det. Winn.  Patterson was calm, or as Det. Winn stated, "subtle."  He was not yet handcuffed.  Kwity showed Patterson the consent form signed by Hodges and informed him that they were going to search the room.  At or about this point, Det. Winn handcuffed Patterson.  During the search, the detectives found a small bag of what appeared to be cocaine inside the sandwich baggie box.  In the baby's bag, the detectives located several small baggies containing marijuana and cocaine, a loaded Kahn .380 caliber handgun, as well as currency and what appeared to be ecstacy pills.

Det. Kwity read Hodges her *Miranda* rights and questioned her again.  Hodges told him she saw Patterson bring the drugs and the firearm to the motel room earlier in the day.  Hodges further stated that Patterson had been in possession of the firearm for about a month and took it everywhere; she also seen him playing with it earlier in the day.

Det. Winn gave Patterson his *Miranda* warnings after the search of the room.  Patterson made

3

a series of incriminating statements regarding the items found in the room.  He stated he was a chronic marijuana user but denied using cocaine.  Det. Kwity asked Patterson if the cocaine, marijuana, currency, and handgun were his.  Patterson "shook his head up and down as if he were saying yes," but then denied the items belonged to him.  In response to further questioning, Patterson denied any knowledge of the items found in the motel room.

### **The Facts as Alleged by Defendant**

Patterson testified that when he heard a knock on the door late at night, he didn't immediately respond to it.  When the detectives knocked again, he asked who was there.  He heard a man say it was the police, and they were investigating suspicious activity.  The man said he wanted to know whether Patterson had seen anything unusual.  Patterson opened the door a crack.  He saw a black officer in a police vest.  He later learned that the officer was Det. Kwity.  The detective repeated that he was investigating suspicious activity and wanted to look in the room.  Patterson opened the door wide enough to allow the officer to see inside.  Kwity asked if anyone was in the bathroom.  Patterson said no.  Kwity asked if he could come in and see for himself.  Patterson told him no.  Kwity asked if Patterson would come outside and talk to them.  Patterson again said no and tried to close the door. Kwity put his arm against it to prevent it from closing and placed his foot over the threshold.  Kwity grabbed Patterson by the arm and pulled him outside.  Patterson was told to talk to the officers who were standing outside.  Det. Sgt. Connell said "put him in cuffs."   As Patterson asked why they were doing this, he noticed Kwity entering the room.  Patterson told him he didn't have permission to go in, but Det. Kwity went in anyway.

Hodges testified that when Det. Kwity entered the room, he threw a shirt to her and told her to get out of the bed.  She did so and was taken outside and handcuffed.  The baby was asleep in the bed. Hodges noticed that Patterson had been placed next to a dark-colored, unmarked vehicle with tinted windows.  From where Hodges was standing, she could see both the car and the inside of the motel room through the open door.  She saw the detectives inside the room "going through things" and searching the room.  After a few minutes, Hodges was led back into the room.

4

According to her testimony, when she reentered the room, a white detective -- Det. Knudson -- confronted her with a baggie of narcotics and said she could get into a lot of trouble.  He directed her to talk to Det. Kwity, who was by the bathroom.  Kwity told her she just needed to cooperate and everything would be all right.  Hodges understood the detectives to be saying that because of the drugs she could get arrested and lose her child.  She asked, "are you going to take my baby away?"  Det. Knudson told her that if she cooperated this would all be over.  He presented her with a consent to search form, which had been filled out to indicate that the detectives were going to search for drugs.  She testified that she didn't read the form, but signed it.  Then she asked if she could pick up her baby, and the detectives allowed her to do so.  Patterson doesn't dispute the government's version of events after Hodges signed the consent to search form.  After the form was signed, the detectives searched the room, and in a baby's bag they found cocaine, marijuana, cash and a firearm.

## DISCUSSION

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  US. Const. Amend. IV.  Fourth Amendment protection against unreasonable searches and seizures is not limited only to one's home but extends to such places as hotel or motel rooms.  *See e.g. Stoner v. California*, 376 U.S. 483, 490 (1964) ("No less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures.") (internal citation omitted); *United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000) ("Because Cormier had a reasonable expectation of privacy in his motel room, the question is whether he voluntarily opened the door or, alternatively, whether there were coercive circumstances that turned an ordinary consensual encounter into one requiring objective suspicion.").  Evidence obtained in violation of the Fourth Amendment, and evidence derived from it, may be suppressed as the "fruit of the poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471 (1963).

### *1. Arrest of Patterson and Entry into Room 133*

Patterson first argues that the knock and talk elevated to an unconstitutional seizure of his person

5

and entry into the motel room.  The Ninth Circuit generally considers knock and talk encounters to be consensual.  *See Davis v. United States*, 327 F.2d 301, 303-04 (9th Cir. 1964); *Cormier*, 220 F.3d at 1109.  However, coercive actions by law enforcement may transform the encounter into an investigatory stop or a seizure. *See  Cormier*, 220 F.3d at 1109.  A person is seized within the meaning of the Fourth Amendment when "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the presence and go about his business."  *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (internal quotations omitted). An arrest must be supported by probable cause.  "The test for probable cause is whether facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person, or one of reasonable caution, to believe, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *U.S. v. Puerta*, 982 F.2d 1297, 1300 (9th Cir. 1992).

The record contains sharply divergent testimony regarding the precise circumstances under which the detectives gained entry into room 133 and took Patterson into custody.  The detectives would have the court believe that late at night in a high crime-rate area, Patterson, whose girlfriend and her infant son were in bed, unhesitatingly swung the door wide open upon hearing a knock and graciously invited the detectives in while he stepped outside to chat with Det. Winn for a few minutes.  The detectives would also have the court believe that notwithstanding that they felt they had probable cause to arrest Patterson, a known convicted felon, for failing to register a new address with Metro, they allowed Patterson to stand outside with Det. Winn -- uncuffed -- for several minutes while the other detectives swept the room and obtained Hodges' consent to conduct a search.  The court finds that the detectives' version of events strains credulity.

The testimony of Patterson and Hodges paints a more plausible picture of what occurred when the police knocked on the door to room 133.  Hearing a knock on the door late at night while his girlfriend and her infant son were in bed, Patterson responded cautiously, opening the door a crack to see whether it was in fact the police, and after satisfied that it was, opening the door only wide enough

6

for them to see into the room.  They asked if they could come in.  He said no and began to close the door.  No doubt frustrated by Patterson's unwillingness to cooperate, Det. Kwity put his foot in the doorway and yanked Patterson out of the room, where he was handcuffed and detained while the detectives entered the room.  Moreover, Det. Kwity's testimony that he didn't remove Hodges and her baby from the room because it was cold outside, when in fact on June 18, 2010 at 11:30 p.m. the temperature in Las Vegas was 88 degrees, casts doubt upon the reliability of his recollection of the events of that evening.  The court finds that the police detained Patterson and entered the motel room without Patterson's consent.  The question is whether the police had a legal basis for doing so.

The government contends that the police had probable cause to arrest Patterson for failure to register a new address, a violation of NRS 179C.110.  The court agrees.  The probable cause determination was based on four elements: (1) confirmation that Dewayne Patterson was a convicted felon; (2) confirmation that a Dewayne Patterson had been registered at the Motel 6 for at least four consecutive days; (3) visual confirmation that the Dewayne Patterson who was registered at the motel was the Dewayne Patterson who was the convicted felon; and (4) confirmation that Patterson had not registered the motel's address with Metro.  Patterson questions whether paying for a room for four days at the Motel 6 constitutes a change of residence within the meaning of chapter 179C of the NRS.  Whether Patterson had established a second residence at the Motel 6 within the meaning of the statute or whether his stay there with Hodges was more akin to a temporary sojourn are mixed questions of law and fact which need not be addressed here.  The court finds that for probable cause purposes, Det. Kwity had sufficient evidence to believe that Patterson was in violation of the felon registration statute.[2]  Having probable cause to arrest Patterson, Det. Kwity was entitled to exert the force necessary to effect the arrest, including preventing Patterson from retreating back into his motel room and shutting the door.

---

[2]  The statute contemplates that a convicted person may have more than one residence, stopping place, or place of abode, and requires that "if there is more than one," he or she provide the location and address of each.  NRS § 179C.110.  Based on this information, Det. Kwity reasonably concluded that Patterson may have established a new or additional residence but had not registered it as such.

7

Upon pulling Patterson from the doorway and arresting him, the detectives entered the room and performed a quick protective sweep to determine whether there was anyone inside who posed a threat to officer safety. This they were entitled to do in view of the strong governmental interest in protecting the safety of officers and others. *Maryland v. Buie*, 494 U.S. 325, 334 (1990)(proper to conduct limited protective sweep of "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched"). The detectives knew that Patterson had been convicted of multiple felonies, including crimes of violence, and they didn't know who, if anyone, was in the bathroom. *See United States v. Gardner*, 627 F.2d 906 (9th Cir. 1980) (holding that agents properly entered a residence to perform a protective sweep to ensure that no potentially dangerous persons were hiding inside). *See also United States v. Standridge*, 810 F.2d 1034, 1037 (11th Cir. 1987)(protective sweep proper "so long as there is uncertainty as to whether there might be others present").

### 2. Hodges' Consent to the Search of Room 133

The physical evidence in this case was found in the baby's bag after Hodges signed the consent to search form, not during the protective sweep. Thus, the pivotal question is whether Hodges' consent to search the room was valid. It is the government's burden to demonstrate that consent to a warrantless search was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Whether consent was voluntary is a question of fact, and its resolution depends upon the totality of the circumstances. *Cormier*, 220 F.3d at 1112 (citing *United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995)). The Ninth Circuit considers five factors in determining voluntariness:

> (1) whether the [consenting individual] was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the [consenting individual] was notified that she had a right not to consent; and (5) whether the [consenting individual] had been told a search warrant could be obtained.

*United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) (quoting *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir.2002)). These factors serve merely as guideposts, "not [as] a mechanized formula to resolve the voluntariness inquiry." *Id.* (quoting *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir.2004)). Coercive police behavior is an important factor to consider. *See United States v.*

8

*Mendenhall*, 446 U.S. 544, 557-60 (1980).  No one factor is determinative.  *Schneckloth v. Bustamonte*, 412 U.S. at 222.

Preliminarily, the court finds that although Patterson rented the room, Hodges was a co-occupant, and therefore had a reasonable expectation of privacy in the room and in the baby's bag that was searched.  Therefore, she had standing to give valid consent to the search. *Illinois v. Rodriguez*, 497 U.S. 177, 181-82 (1990).  On the question of whether Hodges' consent was voluntary, however, there is again a sharp divergence in the testimony.

Det. Knudson testified that Hodges was not free to leave, and that she had not been advised of her *Miranda* rights prior to being provided with a consent to search form.  On the other hand, according to Knudson, Hodges was not handcuffed, the detectives' guns were not drawn, and, importantly, they didn't threaten her in any way.  Knudson testified that before Hodges signed the form he explained it to her, and that she read it to herself as well.  Among other things, the form indicated that she had the right to refuse to consent.

Hodges testified that when the detectives entered her room, one of them handcuffed her and took her outside, while her baby remained asleep on the bed.  From her vantage point outside she could see Patterson being led to an unmarked police car, and, through the open doorway, she could see the officers looking through the room.  She was then allowed back into the room and the cuffs were removed.  One of the detectives -- presumably Knudson -- confronted her with drugs he claimed he had found in the room.  He told her she could get into a lot of trouble over the drugs, but if she cooperated with the police, everything would be all right.  Det. Knudson told her to talk to the black detective -- Kwity -- who also told her that she just needed to cooperate with them and everything would be fine.  To her that meant she could be arrested for drug possession and her baby could be taken from her.  She asked the detectives if they were going to take her baby away.  Again she was told to cooperate and this would all be over.  Det. Knudson then presented her with the consent to search form, told her it gave the police permission to search for drugs, and asked her to sign it.  She testified that she didn't read it; she just signed it.

The validity *vel non* of Hodges' consent to the search of the room turns on whether it was induced by police coercion.  On this issue the court credits Hodges' account of the events that evening. In his testimony Det. Knudson denied that Hodges was threatened in any way.  Viewing his testimony in a light most favorable to the government, the court finds that he did not affirmatively tell Hodges that unless she signed the consent form, she would lose her baby.  Indeed, Hodges herself did not testify that Knudson -- or Kwity, for that matter – uttered those words.  Hodges did testify credibly, however, that the detectives told her three times she could be in a lot of trouble on account of the drugs found in the room, but that *if* she cooperated, everything would be all right.  The last time they said it was after she pointedly asked whether the detectives were going to take her baby away from her.  The court finds that she reasonably interpreted the detectives' words to mean that unless she signed the consent form, they would arrest her and take her baby.

"When law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert [] "improper influence," and such "consent" cannot be said to be voluntary.  *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) (finding confession involuntary where officers repeatedly told defendant she would not see her two-year old son "for a while" if she didn't cooperate, and in reference to her son telling her she had "a lot at stake"); *see United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998)(consent to search house not voluntary where police threatened to take defendant's child into custody and arrest girlfriend); *United States v. Waupekenay*, 973 F.2d 1533, 1536 (10th Cir. 1992)(defendant's wife's consent to search not voluntary where police warned her she would be thrown in jail if she didn't cooperate); *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (confession involuntary where officers told her that state financial aid for her infant children would be cut off, and her children taken from her, if she didn't "cooperate"); *United States v. Patayan Soriano*, *supra*, 361 F.3d at 502-03 (finding consent to search voluntary despite officer's threat to take a woman's children away where several minutes elapsed between officer's threat and signing of the form, but where postal inspector told her that her children were not at risk, and where she seemed to "carefully think the situation through before ultimately

signing the consent form").

Here, late at night, after a knock on the door, the police pulled Patterson out of his motel room and swept through the room with guns drawn. Finding no one but Hodges and a baby in the room, they holstered their weapons. Having forcibly removed Patterson from the room, Hodges no doubt felt she wasn't free to go anywhere (which she wasn't). The police then confronted her with drugs they found in the room, and told her she could be in a lot of trouble unless she cooperated with them. She reasonably interpreted that to mean that her failure to cooperate would result in the police arresting her and taking her baby. They told her to sign the written consent to search the room for drugs and everything would be all right. The court finds that under the totality of the circumstances, Hodge's signed consent was coerced. Accordingly, the search of the baby's bag violated the Fourth Amendment. The fruits of that search must be suppressed.

Patterson seeks suppression of not only the physical evidence seized from the baby's bag, but also the statements he made to the police, and those made by Hodges, following the unlawful search. Patterson offers no theory as to how he has standing on constitutional grounds to seek suppression of the statements made by Hodges. Whether there will be a valid evidentiary objection to the admission of her statements at trial is not an issue presently before the court.

With regard to his own post-*Miranda* statements, Patterson bases his argument on *Wong Sun v. United States*, 371 U.S. 471, 488 (1963), in which the Supreme Court held that the question is whether the evidence was obtained through exploitation of the constitutional violation or by means sufficiently attenuated from the constitutional violation so as to purge the evidence of its original taint. To determine the sufficiency of the attenuation, courts must consider (1) the time elapsed between the constitutional violation and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). *Miranda* warnings alone are insufficient to dissipate the taint of an illegal search. *United States v. Washington*, 387 F.3d 1060, 1074-75 (9th Cir. 2004).

The court has found that Patterson's arrest was lawful because it was based on probable cause

that he violated the felon registration statute.  The court has also found, however, that the subsequent search of the motel room was unlawful because it was the product of Hodges' involuntary consent.  Because neither Hodges nor Patterson consented to the search, the search violated the Fourth Amendment rights of both Hodges and Patterson, who had equal expectations of privacy in the room.  After the incriminating evidence was seized unlawfully, the detectives confronted Patterson with it, gave him the *Miranda* warnings, and questioned him about the contraband that had been found, including the firearm.  Patterson doesn't challenge the adequacy of the *Miranda* warnings or the voluntariness of his responses to the detectives' questions.  The sole issue is whether the police obtained Patterson's statements by exploiting the unlawful search and seizure.

There was virtually no time between the search and Patterson's statements.  The police questioned him immediately after they unlawfully seized the incriminating evidence.  Nor, obviously, were there intervening circumstances that could have purged the taint of the prior illegality, such as release from custody, appearance before a judge, or consultation with an attorney.  *United States v. Washington*, 387 F.3d at 1074.  Finally, the purpose of the unlawful search of the motel room was clearly to find evidence of more serious criminal activity than a mere felon registration violation.  In coercing Hodges' consent by threatening her with the loss of her baby in order to accomplish their mission, the detectives acted in less than good faith toward Patterson.  *Id.* at 1077.  For these reasons the court concludes that Patterson's statements to the detectives were the fruit of the unlawful search, and must be suppressed.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

**RECOMMENDATION**

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Patterson's Motion to Suppress for Fourth Amendment Violation (#21) should be granted to the following extent: the court should suppress the physical evidence seized from room 133 and the statements Patterson made to the police following the unlawful seizure.

DATED this 28th day of February, 2011.

_____
**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**